UNITED STATES *v.* NAGASE ET AL. (NO. 2116).[1]

1. DRUG.

The definition of the word "drug" given by the United States food and drugs act, June 30, 1906, as "any substance or mixture of substances intended to be used for the cure, mitigation, or prevention of disease of either man or other animals" is accepted as applicable in this case.

2. INSECT POWDER AS DRUG.

An insect powder is a drug within the definition of the word in the United States food and drugs act, June 30, 1906, as "any substance or mixture of substances intended to be used for the cure, mitigation, or prevention of disease of either man or other animals;" and so is the active ingredient to be used in the manufacture of such powder.

3. CAMOMILE—PYRETHRUM—INSECT POWDER—DRUGS.

A powder made from camomile or pyrethrum flowers by drying and grinding them, imported for the purpose of being made the active ingredient in Persian insect powder, is entitled to be classified as a drug under paragraph 27, tariff act of 1913. Especially is this true in view of the fact that pyrethrum has long been used therapeutically. It was improperly classified by the collector as a nonenumerated manufactured article under paragraph 385.

## United States Court of Customs Appeals, November 16, 1921.

[Affirmed.]

*Wm. W. Hoppin*, Assistant Attorney General (*John J. Mulvaney*, special attorney, of counsel), for the United States.
*Barnes, Chilvers & Halstead* (*Frank M. Halstead* of counsel) for appellees.

[Oral argument Oct. 26, 1921, by Mr. Hoppin and Mr. Halstead.]

Before DE VRIES, Presiding Judge, and SMITH, BARBER, and MARTIN, Associate Judges.

MARTIN, Judge, delivered the opinion of the court:

The merchandise involved in this case consists of a powder which is produced by first drying and then pulverizing the flowers of a plant known as the wild Japanese camomile. It is chiefly used in this country as an ingredient in the preparation of certain insect powders.

The importation was classified by the collector as a nonenumerated manufactured article, and assessed with duty accordingly at the rate of 15 per cent ad valorem under paragraph 385 of the tariff act of 1913.

The importers protested, contending as an alternative claim that the powder was dutiable at only 10 per cent ad valorem as a drug advanced in condition, falling within the provisions of paragraph 27 of the act.

The Board of General Appraisers heard the case upon evidence and held with the foregoing claim of the importers. The protest

---

[1] T D. 38939.

was accordingly sustained to that effect, and the Government appealed.

The issue therefore as presented by the appeal is whether the classification of the imported powder as a drug within the terms of paragraph 27 should be sustained upon the record now before us.

The following is a copy of the paragraph above referred to:

27. Drugs, such as barks, beans, berries, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, gums, herbs, leaves, lichens, mosses, roots, stems, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, and weeds; any of the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for in this section, but which are advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, 10 per centum ad valorem: *Provided*, That no article containing alcohol shall be classified for duty under this paragraph.

The record contains a copy of all the testimony which was before the board, and we think that the following facts are fairly established by it:

. The powder in question is produced by grinding the dried flowers of the wild camomile plant, known also as pyrethrum. It is chiefly used in this country as an ingredient in the preparation of insect powders. It is known in pharmacy as a drug, under the trade name of Persian insect powder. It is not used as an insect powder in its uncompounded state, but is first mixed with other ingredients. When compounded it constitutes more than 50 per cent of the product in bulk, and supplies its active or effective qualities, the other ingredients serving merely as carriers for it. Insect powders of this kind are handled by druggists and are known in the trade as drugs. They are sold to hospitals and medical institutions and are used for the extermination of disease-carrying insects as well as ordinary house insects. Such powder is used to a limited extent by human beings, by being sprinkled upon the body; it is also used to a considerable extent upon animals for the purpose of destroying parasitical insects upon them.

It furthermore appears from the record that for hundreds of years the dried flowers of the camomile or pyrethrum plants have been commonly used in the preparation of medicinal teas and purgatives, and for many years they have been imported in quantities into this country for such uses. The flowers thus imported, however, came from Dalmatia and not from Japan. They were considered to be drugs of medicinal value. During the World War, however, importations of Japanese wild camomile or pyrethrum were received in this country. They appear to have been used chiefly, perhaps exclusively, in the manufacture of insect powders as aforesaid, but, nevertheless,

they were capable of use in the compounding of remedies similarly with the Dalmatian importations. We have this on the authority of Dr. Amend, one of the witnesses before the board, who was pronounced by both parties, and also by the presiding general appraiser, to be well qualified as a chemist and pharmacist. His testimony reads in part as follows:

Q. Have you used either of the articles marked "Exhibit 1" and "Exhibit A" in the preparation of any medicinal compounds in this country?—A. We have used the wild camomile, not the Japanese.

Q. I mean the wild camomile or pyrethrum from different sources?—A. Certainly. They are official in the German pharmacopoeia.

Q. Have you made any such preparations here in the United States to any extent?—A. Yes; large quantities.

Q. Could those preparations have been made with the material which you see before you, Exhibit 1 and Exhibit A?—A. With the same breed. I would say the same kind of a flower, but not from Japan.

Q. I say, could you have made the same preparations with these articles here in question from Japan?—A. Yes; certainly.

By Mr. MULVANEY:

Q. But you did not?—A. We did not have any at that time. The first Japanese flowers that we imported for the purpose were imported during the war or may be after the war. Previous to that we received them from Dalmatia.

Q. Do you use them since they came in in your preparations in the same way you used the camomile from other countries?—A. No.

Q. Then, so far as you know, these particular commodities from Japan are never used in this country, at least by your house, in the preparation of medicinal compounds?—A. Not to my best knowledge, no.

By Mr. BARNES:

Q. From a commercial standpoint, to what trade do you sell the article similar to Exhibit I and illustrative Exhibit A?—A. To wholesale and retail druggists.

This epitome of the evidence describes the powder now before the court, and the question is whether it may be classified as a drug under the paragraph above quoted. We must therefore seek a definition of the term "drug" as thus employed.

We are cited by counsel in their briefs to the United States food and drugs act, June 30, 1906, for an acceptable definition of the word "drug," part of the definition reading as follows: "any substance or mixture of substances intended to be used for the cure, mitigation, or prevention of disease of either man or other animals."

We accept this definition as applicable in the present case, and we think that the imported powder responds to its terms and accordingly may rightfully claim the name of drug thereunder. For when it is remembered that insect powder which consists only of the imported powder mixed with an inert carrier is especially useful in hospitals and medical institutions for the extermination of disease-bearing insects, such as fleas, mosquitoes, and lice, thus directly assisting in the successful treatment of the patients in such institu-

tions; and that it is useful and in fact is used for exterminating lice and other parasites upon the human body and upon the bodies of animals, and that such parasites sometimes themselves constitute a disease when infesting the bodies of animals; and, furthermore, that the flowers from which the powder is produced belonged to a species long known and imported as drugs useful for their medicinal qualities, which qualities are possessed in a useful measure by the present article, it must be admitted that the article is in fact a substance which is intended to be used for the "mitigation or prevention of disease of either man or other animals," and thus responds to the definition of the term "drug" as above given.

This conclusion finds support in the undisputed fact that the wholesale and retail drug trade in this country regard the article as a drug and list it and deal in it accordingly. It is manifest that the trade does not regard it as a mere "druggist's sundry," but as a true drug because of its relation to the prevention and cure of human and animal ailments.

The fact that the imported powder is not used alone in its condition at importation as an insecticide, but serves only as an ingredient in a compounded preparation, does not affect the present question. United States *v.* McKesson & Robbins (7 Ct. Cust. Appls., 13, 16). Nor do we regard the decisions in the cases of United States *v.* Maine Central Railroad Co. (7 Ct. Cust. Appls., 114); United States *v.* Leavitt (idem, 144); and United States *v.* Eastern Drug Co. (idem, 210) as relevant to the present issue. The merchandise in those cases was spruce gum which was used exclusively as a material in the manufacture of chewing gum.

We may also note that under the tariff act of 1897 the board in T. D. 23387 (G. A. 5036) held that pyrethrum stems, intended for use in the manufacture of insect powder, were classifiable for duty as "drugs." It may be assumed that this classification obtained until the year 1919, when a change was proposed by the collector at the port of New York and was approved by the department, whereby such and similar materials were assessed with duty as nonenumerated articles. (T. D. 38123.)

In accordance with the views above expressed the decision of the board is *affirmed.*