(C. D. 978)

THOMPSON HAYWARD CHEMICAL CO. v. UNITED STATES

United States Customs Court, Third Division

(Decided January 25, 1946)

*Philip Stein* for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Joseph E. Weil, John J. McDermott*, and *Richard F. Weeks*, special attorneys), for the defendant.

Before Cline, Keefe, and Ekwall, Judges; Ekwall, J., concurring in the result

Cline, Judge: These are suits against the United States arising at the port of New Orleans by protest against the collector's classification of pyretoxin No. 18 or pyrethrum extract as a nonenumerated manufactured article, dutiable at 20 per centum ad valorem under paragraph 1558 of the Tariff Act of 1930. Plaintiff claims that the merchandise is dutiable at 10 per centum ad valorem under paragraph 34 as an advanced drug, at 10 per centum under paragraph 35 as pyrethrum flowers, or at 10 per centum under paragraph 1558 as a nonenumerated unmanufactured article.

Protest was also made against the assessment of duties on the drums containing the merchandise but that protest was abandoned at the trial.

The pertinent provisions of the tariff act are as follows:

PAR. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

PAR. 34. Drugs, such as barks, * * * flowers, * * * and all other drugs of vegetable or animal origin; any of the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, but which are advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, 10 per centum ad valorem: *Provided*, That the term "drug" wherever used in this Act shall include only those substances having therapeutic or medicinal properties and chiefly used for medicinal purposes: *And provided further,* That no article containing alcohol shall be classified for duty under this paragraph.

PAR. 35. Aconite, * * * pyrethrum or insect flowers; all the foregoing which are natural and uncompounded, but which are advanced in value for condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to proper packing and the prevention of decay or deterioration pending manufacture, 10 per centum ad valorem: *Provided*, That no article containing alcohol shall be classified for duty under this paragraph.

A report of the United States customs laboratory in New Orleans contains the following description of the merchandise:

1 Sample of Pyrethrum Extract
------------------------------
Yellow brown extract, odor of Pyrethrum.
Pyrethrum extract in a petroleum distillate, 26.30% solids.
Sample does not contain alcohol.
Sample does not contain prohibited drugs.
See Par. 1558 and T. D. 47230.

The only witness at the trial was George M. Hayward, president of the plaintiff company. He stated that he had been connected with the company for 25 years; that its business was the importation and distribution of imported and domestic chemicals and drugs; that they

sold their products to wholesale druggists and pharmaceutical manufacturers; that he was familiar with the products offered for sale; and that he had been food and drug inspector for Kansas City for 3 years.

Mr. Hayward's testimony may be summarized as follows: Pyrethrum is a product derived from flowers of the chrysanthemum family. It has been sold for many years in powder form, known as pyrethrum powder, and has more recently been sold in liquid form, known as pyrethrum concentrate. Pyrethrum flowers are grown in Japan, Hungary, and Africa, but not in the United States. Both the flowers and the liquid have been imported. Pyrethrum in both the powder and the liquid forms is used as a repellent and a killer of flies, mosquitoes, lice, and vermin of many types, including lice and parasites which are on humans and animals. It is not given internally as a medicine.

Mr. Hayward described the process by which the liquid is prepared in this country. The pyrethrum flowers are ground into a coarse form and are placed in a percolator with a perforated plate at the bottom. Solvent material is put in at the top and passes through the flowers continuously, with more solvent being added when necessary, until the flowers are completely exhausted. Two types of solvent are used: coal-tar benzol when a very highly concentrated product is desired, and naphtha when a less highly concentrated product is desired. When benzol is used certain waxes and oleoresins are extracted from the flowers into the liquid, but when naphtha is used the waxes and resins remain in the flowers. After the solvent is run through the crushed flowers, the residue, consisting of plant fibers resembling macerated flowers, is thrown away.

Although no testimony was given as to how the imported product was manufactured, Mr. Hayward stated that the article itself was the same as that manufactured in the United States except insofar as the strength was concerned. The imported product is known as a 71 to 1 strength material because it represents 71 pounds of flowers for each pound of concentrate. The waxes and oleoresins had not been removed from the imported product. After importation the waxes and oleoresins had to be removed and the product diluted in order to obtain a commercially usable commodity. The diluted liquid is used to make sprays and insecticides having a 1 to 1 strength, i. e., 1 pound of flowers to 1 gallon of spray material. Sometimes other ingredients, such as roots containing rotenone, are added to increase the power of the product. A portion of the distillate of petroleum used as a solvent remains as one of the ingredients of the product.

Apparently the liquid form is now preferred because there is a grinding loss of 5 or 10 per centum when powder is made and because

the liquid form deteriorates less rapidly than the flowers themselves.

The above testimony is insufficient to establish the exact method of production of the imported merchandise; Mr. Hayward had never seen the preparation of the merchandise in the country of production. Since he is not a chemist nor a druggist, his statement that the imported product is the same article as that produced by his company is entitled to little weight. We are left with the fact that the merchandise is pyrethrum extract in a petroleum distillate, as reported by the United States customs laboratory.

Plaintiff claims that the merchandise is classifiable under paragraph 34 as a drug, advanced, since that is a designation by use which takes precedence over a designation *eo nomine*. (*United States* v. *Snow's-United States Sample Express Co.*, 8 Ct. Cust. Appls. 351, T. D. 37611; *Factor* v. *United States*, 15 Ct. Cust. Appls. 401, T. D. 42570.)

Paragraph 34 of the Tariff Act of 1930 defined drugs as substances having therapeutic or medicinal properties and chiefly used for medicinal purposes. Therapeutic and medicinal are defined as follows (Webster's New International Dictionary, 1933 edition):

**therapeutic.** Of or pertaining to the healing art; concerned in discovering and applying remedies for diseases; curative.

**medicinal.** Curative or alleviative; used for the cure or alleviation of bodily disorders.

While an insecticide does not appear to be a curative of diseases, it may be a preventive, since diseases are carried by insects and other vermin. In *United States* v. *Nagase*, 11 Ct. Cust. Appls. 144, T. D. 38939, the merchandise consisted of a powder produced from the wild camomile plant, known also as pyrethrum. It was held that the insect powder was included within the meaning of the term "drug" since it was "useful in hospitals and medical institutions for the extermination of disease-bearing insects, such as fleas, mosquitoes, and lice, thus directly assisting in the successful treatment of the patients in such institutions; and that it is useful and in fact is used for exterminating lice and other parasites upon the human body and upon the bodies of animals, and that such parasites sometimes themselves constitute a disease when infesting the bodies of animals; * * *." See also *Kennedy & Moon* v. *United States*, 4 Treas. Dec. 936, T. D. 23387, G. A. 5036, holding that pyrethrum stems and stalks cut in pieces were entitled to free entry as crude drugs.

In the Summary of Tariff Information, 1921, Relative to the Bill H. R. 7456, it is shown that a new paragraph was proposed to include many articles provided for *eo nomine* in the free list, certain nonenumerated articles, and certain articles classified under paragraph 27 of the Tariff Act of 1913, as drugs, advanced. Since pyrethrum or insect flowers had been classified as an advanced drug under paragraph 27 (*United States* v. *Nagase, supra*), the new provision

indicated an intention by Congress to remove them from the drug paragraph and place them under the specific provision. Consequently, a product of pyrethrum or insect flowers excluded from the provisions of paragraph 35 would not be dutiable under the provisions of paragraph 34 since the term "flowers" is limited in its scope by the same descriptive language.

We must consider then whether the imported product is classifiable under paragraph 35 which includes pyrethrum flowers in their natural and uncompounded state, advanced only by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to proper packing and prevention of decay. Two questions are involved: whether "advanced by any other process or treatment whatever" includes the percolation process apparently employed here, and whether the merchandise is in a natural and uncompounded state.

In *Lehn & Fink* v. *United States*, 4 Ct. Cust. Appls. 325, T. D. 33522, it was claimed that sirup of rhamnus, extract of gentian, and extract of taraxacum were dutiable as drugs, advanced, under paragraph 20 of the Tariff Act of 1909 (similar to paragraph 34 of the Tariff Act of 1930). The sirup of rhamnus was produced by expressing the ripe berries of the buckthorn plant and mixing with sugar. The extract of gentian was a dry powder made by extracting the gentian root with water and evaporating the solution to dryness and powdering it. The extract of taraxacum was a dry powder obtained by evaporating the juices of dandelion roots. The court said (p. 326):

* * * In our opinion, paragraph 20 is limited by its terms to such natural uncompounded drugs as inedible barks, beans, berries, roots, and so forth, and does not extend to infusions, decoctions, or extracts made from such substances. In the process of manufacture the physical properties and distinguishing characteristics of the roots and berries from which the infusions, decoctions, and extracts are made were lost so completely that in no sense could the latter be properly called "drugs, such as barks, beans, berries, * * * roots," and so forth. Paragraph 20 does provide for certain enumerated drugs "advanced in value or condition by any process or treatment whatever." Nevertheless the limitation of the paragraph to natural drugs makes it clear, we think, that there was no intention to extend its provisions to drugs artificially produced or to manufactures of such natural drugs. This interpretation makes the paragraph entirely consistent with other related parts of the law and avoids the necessity of considering as surplusage the provision for "extract of nutgalls, aqueous," a product which is specially provided for in paragraph 22 at the same rate of duty as that prescribed for "nutgalls" in paragraph 20.

That decision is in conformity with the statutory rule of construction that where particular words of a statute are followed by general words, the general words are restricted in meaning to matters of like kinds with those specified. (*United States* v. *Stever*, 222 U. S. 167, 175.) Later decisions of this court, such as *Atlantic Coast Fisheries Corp.* v. *United States*, 6 Cust. Ct. 415, C. D. 506 (oil ex-

tracted from fish livers by the use of soybean oil); *Synthetic. Patents Co., Inc.* v. *United States*, 11 Cust. Ct. 147, C. D. 813 (cholic acid obtained from bile stones with the use of acetone); *Synthetic Patents Co., Inc.* v. *United States*, 12 Cust. Ct. 148, C. D. 845 (tachysterol obtained by extracting ergosterol from yeast, subjecting that to irradiation, and converting the resultant mixture into esters), may be distinguished on the ground that the extraction processes in those cases constituted the means used to separate the natural and uncompounded articles provided for in the drug paragraph from their surrounding tissue.

There is the further question as to whether the merchandise herein is in its natural and uncompounded state. In the case of *United States* v. *Stone & Downer Company*, 175 Fed. 33, the court said that the word "compound" in the tariff act was not used in its chemical sense but was to be given its natural meaning as commonly understood. It was held that belladonna leaves and stalks placed in alcohol for the purpose of maceration formed an alcoholic compound.

Webster's New International Dictionary, 1933 edition, gives the following definitions:

**compound,** *n.* That which is compounded, or formed by the union or mixture of elements, ingredients, or parts; a combination of simples; a composition.
**compound,** *v.* (1) To put together, as elements, ingredients, or parts, in order to form a whole; to combine, mix, or unite.
(2) To form or make up, as a composite product, by combining different elements, ingredients, or parts; as, to *compound* a medicine.

In *Atlantic Coast Fisheries Corp.* v. *United States, supra,* the court said (p. 419):

Since it appears that the sesame or soya-bean oil mixed with certain of the fish-liver oil in question had no effect other than as agents assisting in the extraction of the oil from the livers and as preservatives of vitamin content of the oil so extracted, we are satisfied that the fish-liver oil so mixed was not compounded with the vegetable oils named so as to become a compounded drug excluded from classification under paragraph 34, and it is indisputable that the plain or crude fish-liver oil involved was not compounded.

In the instant case the testimony indicates that the solvent was used to extract the pyrethrum from the flowers and that a part of it remained in the finished. product. Such a mixture appears to be a compound within the common meaning of that term.

That Congress did not intend that extract of pyrethrum should be classified as a drug, advanced, under paragraph 34 or as pyrethrum flowers under paragraph 35 is indicated in the Summary of Tariff Information, 1929, p. 178:

Advanced pyrethrum is produced by grinding the crude product to a very fine powder. This may be used alone as an insecticide, mixed with various other substances, or extracted with kerosene or a similar substance. Nearly all of the "fly sprays" and like preparations on the American market are substantially liquid extracts of pyrethrum.

Advanced pyrethrum was to be limited to the powder form; the liquid extract was not considered a form of pyrethrum flowers.

We think that since the merchandise herein was produced by a process not similar to shredding, grinding, chipping, or crushing, and since it is a mixture of ingredients and thus a compound within the common meaning of that term, it is not pyrethrum flowers "natural and uncompounded."

Although not included in the protests, plaintiff now claims that the similitude clause in paragraph 1559 is applicable and that the merchandise is dutiable at 10 per centum by similitude to the drugs enumerated in paragraph 34 or the pyrethrum flowers provided for in paragraph 35. (It has been held not absolutely necessary to make express claims for similitude in protests. *Rice* v. *United States*, 10 Ct. Cust. Appls. 165, T. D. 38403, affirmed in *United States* v. *Rice*, 257 U. S. 536.)

Plaintiff claims that the merchandise is similar in material to the drugs enumerated since it is the extract of the pyrethrum flowers; that it is similar in quality since the same amount of pyrethrins is contained in the liquid extract as in the flower; that it is similar in texture because it is similar to the liquids (fish-liver oil, cholic acid) held dutiable under paragraph 34; that it is similar in use since it is used as an ingredient in insecticides. However, it would seem that the similitude provisions could not apply because there is an identity between the merchandise herein and those enumerated: drugs in paragraph 34, and pyrethrum flowers in paragraph 35. Those two paragraphs would cover the merchandise were it in a certain condition: natural and uncompounded. Where the tariff act prescribes a duty for a material when it is in a certain condition, it precludes the application of the similitude clause to the same material when it is in a different condition. *Schoenemann* v. *United States*, 119 Fed. 584; *Fensterer & Ruhe* v. *United States*, 1 Ct. Cust. Appls. 93, T. D. 31110; *Cresca Co. (Inc.)* v. *United States*, 17 C. C. P. A. 83, T. D. 43376.

In *United States* v. *Post Fish Co.*, 13 Ct. Cust. Appls. 155, T. D. 41022, fish roe imported for food purposes packed in pails was held to be a nonenumerated unmanufactured article. Paragraph 721 of the Tariff Act of 1922 provided for "fish roe for food purposes, packed in ice or frozen, prepared or preserved" and paragraph 1569 of that act provided for fish eggs except fish roe for food purposes. The court said (p. 159):

The Congress, in framing the language of paragraph 721, supra, used the language "fish roe for food purposes, packed in ice or frozen, prepared or preserved," by the addition of salt in any amount, or by other means." If it had been intended to include all fish roe for food purposes, simple and plain language to that effect would have been sufficient. But the tariff rates of that paragraph were specifically restricted to certain kinds of fish roe, or that imported in a certain condition. Having thus excluded from the language used words which

would have included the fish roe in question here, it will be assumed that Congress did not intend to include it within the scope thereof, but under some other provision.

In the instant case Congress had provided for drugs and also for pyrethrum flowers when natural and uncompounded; thus excluding them when in a different condition.

In *Rolland Frères (Inc.)* v. *United States*, 11 Ct. Cust. Appls. 321, T. D. 39141, braids, strips, and sheets made of hydrocellulose were involved. The collector had classified them as articles composed of yarns, threads, filaments, or fibers of artificial silk. The court said (p. 325):

> The goods which are the subject of appeal to this court, are either visca or cellophane, and as they are composed wholly of hydrocellulose they are not similar but identical in material with hydrocellulose which by manufacturing processes has been converted into artificial silk, that is to say, into yarns, threads, fibers, or filaments, and articles made of such yarns, threads, fibers, or filaments. Inasmuch as there is identity, not similarity of material, none of the visca or cellophane and none of the articles here involved, made of visca or cellophane, can be said to be dutiable by *similitude of material* to artificial silk or to articles made of artificial silk.
>
> Paragraph 319 subjects to duty artificial silk; that is to say, hydrocellulose in the form of yarns, threads, or filaments and of articles or fabrics in chief value of such yarns, threads, fibers, or filaments. Congress having seen fit to provide for hydrocellulose in its condition as artificial silk, it can not be held that such a provision was intended to cover by similitude of material hydrocellulose not in that condition. (Citing cases.)

Under these authorities, the merchandise herein cannot be held dutiable by similitude to either drugs or pyrethrum flowers, natural and uncompounded, but advanced by shredding, grinding, chipping, or crushing. The merchandise is in a liquid condition—a condition not contemplated by the statute.

Plaintiff further claims that even if the merchandise must be classified under paragraph 1558, it is an unmanufactured rather than a manufactured article. We note that no claim is made as to paragraph 1558 in protest No. 968101-G but such a claim is made in the printed portion of protest No. 944223-G. Every application of labor to an article does not make it a manufacture in a tariff sense; it must appear that something has been produced which has a distinctive name, character, or use different from that possessed by the original material. (*Hartranft* v. *Wiegmann*, 121 U. S. 609; *Tidewater Oil Co.* v. *United States*, 171 U. S. 210; *Anheuser-Busch Association* v. *United States*, 207 U. S. 556; *Ishimitsu* v. *United States*, 11 Ct. Cust. Appls. 186, T. D. 38963.) In the instant case the original material was pyrethrum flowers; the article under discussion is pyrethrum extract. The two articles have different names and different characteristics, one being a solid and the other a liquid. They are both used as ingredients in insecticides, but the flowers

must be powdered before they can be used and the liquid is ready for use.

Plaintiff relies upon the statement in *Cone & Co. (Inc.) v. United States*, 14 Ct. Cust. Appls. 133, T. D. 41672, "Nor are we of opinion that the processes of extraction from the leaf can be said to be manufacturing processes." In that case, however, the palmyra leaf was cut from the tree, the usable part removed from the balance of the leaf by cutting; the pattal pounded to free the fibers from the pulp; and the fibers hackled by being drawn through nails embedded in a board. Such a process is in no way similar to the percolation process by which the pyrethrum extract was obtained.

In *Shell Oil Company of Canada, Ltd. v. United States*, 27 C. C. P. A. 94, C. A. D. 68, the question was whether a "liquid petroleum residue from crude petroleum" derived from American crude petroleum was subject to internal revenue tax under section 601 of the Revenue Act of 1932. The importer claimed that the article was free of duty under paragraph 1615 of the Tariff Act of 1930 on the ground that it was a product of the United States returned without having been advanced in value by any process of manufacture. The crude petroleum had been subjected to a "cracking process" by means of which gasoline was extracted and the petroleum residue remained. The court found that the process by which the separation of materials was brought about was a process of manufacture.

In *United States v. Rubelli's Sons*, 8 Ct. Cust. Appls. 399, T. D. 37645, certain zinc spelter was exported to Canada to be used in galvanizing iron pipe. The zinc was placed in iron tanks and heated to a molten condition and treated with acids. The iron pipes were then immersed in the molten spelter thereby coating them with zinc. Some of the zinc crystallized and fell to the bottom of the tank. That was returned to the United States and was claimed to be entitled to free entry. The court held that what was exported from the United States was zinc and what came back was zinc and was therefore free of duty.

In *United States v. Tower & Sons*, 9 Ct. Cust. Appls. 135, T. D. 37981, tungstic acid was exported in the form of impalpable yellow powder for use in the manufacture of tungsten wire. It was dissolved in ammonia and insoluble materials consisting of small lumps of material containing tungsten, lime, and other impurities were filtered out. The court found that the process was not a manufacturing process, because no new product was produced. However, where the tungstic acid powder was used to produce metallic tungsten in small ingots or wire, it was held that the process was a manufacture.

In *United States v. Half Moon Manufacturing & Trading Co.*, 24 C. C. P. A. 232, T. D. 48668, starch and vegetable albumen were obtained by a process in which:

wheat flour, is mixed with water and kneaded, and afterwards the starch is washed out in a washing machine. The protein however, during the washing process,

remains in the washing machine, and after the starch has been entirely washed out, the remaining protein is dried and ground and constitutes the merchandise sold by us under the name of Vegetable Albumen.

The court said that neither the starch nor the albumen had all of the qualities of the wheat flour from which they were produced and held that the vegetable albumen was a manufactured byproduct.

In *A. J. Murray & Co.* v. *United States*, 7 Cust. Ct. 160, C. D. 560, there was involved fatty acids obtained from linseed oil by the following process:

Linseed Oil is mixed with about 25% water and is heated for 36 hours in a closed tank (with only a small outlet for steam), while adding 1% acid decomposing oil, which acts as catalyst. After about 36 hours the steam is shut off and the tank is left undisturbed for a few hours. The glycerin water, which has a greater specific gravity than the fatty acids, settles on the bottom of the tank, while the fatty acids float on top. The glycerin water is now tapped off and the fatty acids are tapped (drawn-off) into the fatty acid tanks in order to thereupon be transferred into barrels or drums for shipment.

It was held that this process was a manufacturing process inasmuch as two new products had been produced, glycerin and fatty acids.

While none of these cases involve a percolation process by which an extract is obtained, they indicate that if the process is one by which new products are obtained, it is a manufacturing process. In the instant case, the resultant products are pyrethrum extract and fibers, each having some of the characteristics of pyrethrum flowers. We think, therefore, that the pyrethrum extract is a manufactured article.

For the reasons above stated, we hold that the merchandise is dutiable at 20 per centum ad valorem under paragraph 1558 of the Tariff Act of 1930 as a nonenumerated manufactured article. The protests are overruled and judgment will be entered accordingly.