HARRISON SUPPLY Co. *et al.* *v.* UNITED STATES (No. 1333).[1]

1. CRUDE ARTIFICIAL ABRASIVES.

The term "artificial abrasives" implies an abrasive product resulting from some processing or treatment, and the word "crude" implies that such artificial product must be in a crude condition. The merchandise here is a finished, not a crude, article, not being designed for further processing.

2. IRON SAND, GLOBULAR AND ANGULAR IN SHAPE.

The testimony showed that the globular iron sand was used in substantial quantities as counterpoise in the manufacture of scales and cement, that the angular shapes thereof were used in the manufacture of cement, and so negatives the idea that the sand could only be used as abrasives, as required by paragraph 133, tariff act of 1909. It was dutiable as an unenumerated manufactured article under paragraph 199 of that act.

United States Court of Customs Appeals, April 14, 1915.

APPEAL from Board of United States General Appraisers, G. A. 7514 (T. D. 33980), Abstract 34346 (T. D. 34026), and Abstract 34374 (T. D. 34033).

[Affirmed as to part; reversed as to part.]

*Searle & Waterhouse* (*William E. Waterhouse* of counsel) for appellants.
*Bert Hanson*, Assistant Attorney General (*Charles D. Lawrence*, special attorney, of counsel), for the United States.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

BARBER, Judge, delivered the opinion of the court:

This case relates to the protests of the Harrison Supply Co., above named, as well as to those of five other importers, and a considerable number of importations and protests are here for review. The merchandise is generally known as iron shot, iron sand, or iron grit, and is of two classes, one globular and the other angular in shape. Quoting from the testimony of Mr. Harrison, the president and manager of the Harrison Supply Co., which seems to be accepted as correctly setting forth the same, we learn that the globular merchandise is produced in the following manner:

A miscellaneous amount of iron and scrap metals are put into a cupola and melted together with coke and limestone and other minerals, and this molten metal runs down a short runway—the molten metal is about the thickness of a finger—and drops on a jet of steam at approximately eighty pounds pressure, which scatters the molten metal into water. It drops into water.

Thereafter it is dried and graded into about 10 different sizes by passing through sieves of different fineness of mesh. The sizes of this globular product recognized and used by the importers, the Harrison Supply Co., and by Harrison Bros., the manufacturers thereof in England, are 1C, 1, 1F, 2C, 2F, 3, 4C, 4F, 5, and 6. Of these sizes 1C, the first, is the coarsest and 6 the finest. Other manu-

facturers have substantially equivalent grades, but the same are differently numbered. The coarsest is about the size of bird shot, while the size of the finest much resembles that of fine sand.

The angular product, of which a very much less quantity is imported than of the globular, is obtained by crushing the latter. It is graded to much finer sizes than is the globular, the finest of which seems to be like dust. The globular product appears to be valued from $9 to $30 per ton according to size, the coarser sizes being the more valuable, while the angular product apparently is worth from $15 to $25 more per ton, it costing about that amount to crush the same. Bulk for bulk both classes of this merchandise are heavier than ordinary sand and lighter than lead.

All the merchandise was assessed under paragraph 133 of the tariff act of August 5, 1909, which is as follows:

133. Grit, shot, and sand made of iron or steel, that can be used only as abrasives, one cent per pound.

Obviously this results in a duty of $20 per ton, equivalent to an ad valorem tax of from about 220 per cent on the cheapest to 66 per cent on the most valuable of the globular product. The resulting rate upon the angular product is not readily ascertainable, because the record is not clear as to what grades of the globular product are used in the manufacture of the angular. Merchandise substantially like both of these classes is produced in this country.

It is conceded at the outset by the importers that by far the greater amount of both kinds of the imported merchandise is used for abrasive purposes.

The Board of General Appraisers sustained the collector.

The importers claim that the globular merchandise is dutiable at 10 per cent ad valorem under paragraph 432 of the act of 1909, which provides for "crude artificial abrasives," or, in the alternative, at 45 per cent ad valorem under paragraph 199 as an unenumerated manufactured article composed wholly or in part of metal. The latter classification is the only one claimed by the importers to be applicable to the angular merchandise.

We proceed to a consideration of the first-mentioned claim of the importers relative to the globular merchandise.

Paragraph 432 is as follows:

432. Emery grains and emery. manufactured, ground, pulverized, or refined, one cent per pound; emery wheels, emery files, and manufactures of which emery or corundum is the component material of chief value, twenty-five per centum ad valorem; crude artificial abrasives, ten per centum ad valorem.

It will be noticed that the part relied upon by the importers follows provisions for manufactured, ground, pulverized, or refined emery, and manufactures of which emery or corundum is the component material of chief value. The term "artificial abrasives"

implies an abrasive product resulting from some processing or treatment, and the word "crude" implies that such artificial product must be in a crude condition. We do not think this merchandise is such, because it is finished and ready for any use for which it is primarily designed, and is even graded for the convenience of such uses. It does not follow, because this is its first appearance as an article of commerce, that it is crude; a finished, and not a crude condition may be a necessary incident to the methods employed in its production. If the molten metal had been permitted to harden before being made into shot or sand and in that condition was imported, it might then be a crude artificial abrasive. But such a stay in its production probably is not, in a manufacturing sense, feasible or practicable and is not, therefore, employed. At all events we have here for consideration a finished and not a crude article; one not primarily designed or intended to be further processed or treated and which, as a matter of fact, is not, except in relatively small quantities.

It might well be argued that the term "crude artificial abrasives," as employed in paragraph 432, contemplates an artificial abrasive that has not, by manufacturing, grinding, pulverizing, or refining, been reduced to small particles, such as "grains." In other words, that it relates to an artificial abrasive imported in larger units or cruder forms than grains or the grades in the case at bar.

A similar view of the paragraph evidently was entertained by the Board of General Appraisers in a former decision, which involved some of the same kinds of merchandise as that now before us. See In re Harrison Supply Co., G. A. 7249 (T. D. 31773). It was there said that Congress, in providing for crude artificial abrasives, undoubtedly had in mind "an article like 'carborundum' in the form in which it leaves the electric furnace," and that carborundum is "a substitute for emery and corundum."

It is not our purpose, however, to attempt here to define what may be dutiable under that part of the paragraph relied upon in this case, but it is sufficient to say that, on the record now before us, we think the importations under consideration are not so dutiable. See Harrison Supply Co. v. United States (171 Fed., 406).

The remaining question is, Under which of the two paragraphs—133 or 199—are these importations classifiable?

The board in substance held that the evidence showed that the only real, commercial, practical, and bona fide use of both classes of the merchandise was as an abrasive, and such is here the contention of the Government.

As already stated, the importers concede that by far the greater part of the merchandise is devoted to that use. They claim, however, that the evidence clearly establishes, and that the board should

have found, that all sizes of the globular product are used in this country in balancing scales, that is, in filling the counterpoise cups used for that purpose; that one or two of the finest sizes thereof are used in the manufacture of metal cement; that certain sizes are used in washing bottles; and that all the finer sizes of the angular product, beginning with number 5, are used for the purposes of making metal cement—all of which uses are concededly nonabrasive. Other uses are claimed to be established, but we deem it unnecessary to consider them.

This challenge of the correctness of the board's finding upon a question of fact demands a review of the evidence.

The taking of testimony before the board began March 6, 1911, and closed May 1, 1913. The record is voluminous.

Mr. Harrison, before referred to, was an important witness for the importers. His company represents and handles in this country all the imported products of three of the four foreign concerns which manufacture the merchandise involved in these protests. It also handles to some extent the products of the fourth foreign manufacturer. From his boyhood in Scotland he has been familiar with the business, and since 1891 has been engaged in handling abrasives in this country, among which are alundum, carborundum, carbosilite, adamite, aloxite, and the merchandise under consideration. He testified that prior to the enactment of the tariff act of 1909 he regularly sold and was selling the globular merchandise in substantial quantities to scale manufacturers to be used and that it was in fact used by such manufacturers to his personal knowledge in weighting the counterpoise weights of scales; that he had regular customers who so used the merchandise to whom he was selling it in one and two ton lots; that such use had continued to and was persisting during the time of the hearings before the board; that 1C and 1 and 1F were the sizes most commonly used for the purposes; that all the ten sizes were so used and that the demand for the merchandise for that particular use was increasing. His testimony related chiefly to the grade sizes of Harrison Bros., but he said the corresponding sizes of the other manufacturers could be and were interchangeably used for the same purposes. Mr. Harrison's testimony tended to show, and was not disputed, that this merchandise was also used in cleaning bottles; that he had sold it for that use, especially sizes 1F, C2, and C4, but he did not state the extent of such use or the amount of sales therefor. He further testified that in 1909, prior to August 6, he sold the globular merchandise in substantial quantities to cement manufacturers who used it in making metal cement to fill blow holes in iron castings and that such sales and such use obtained from that time to the date of his testimony. These sales were mostly of sizes 5 and 6, although perhaps some coarser sizes were sold and used for

that purpose. The amount of such sales prior to August, 1909, does not very definitely appear, but then or soon after, the sales were in ton lots to one or more customers. The demand for that use was increasing.

Mr. Harrison was corroborated in his testimony as to the use of the globular merchandise in the counterpoises used to balance scales by several employees of the Fairbanks Scale Co., of St. Johnsbury, Vt. Their testimony in substance was that before the act of 1909 various sizes of the merchandise, from the coarsest to the finest, although not of every size, were regularly used by that company in the manufacture of scales, more especially perhaps of platform scales. It appears from this evidence that any of the 10 sizes mentioned could be used for the purpose and that the counterpoises of platform scales, in which the globular merchandise was chiefly if not wholly used, required from 3 ounces to 3 pounds per counterpoise; that the number of scales put up by the company in which the globular merchandise was so used varied from an average of 100 scales a week in 1911 to about 650 or 700 a week in 1912 or 1913; that the average amount of shot used to a scale was about 9 ounces. It also appeared by the same witnesses that in making this class of scales the company had largely substituted the globular merchandise for lead shot and, where necessary, was increasing the size of its counterpoise cups to hold the greater bulk thereof required over the lead shot. This testimony was uncontradicted except by the testimony of Mr. Horton, which will later be hereinafter referred to.

Mr. Kann, a witness called on behalf of the Government, testified that the finest sizes of the angular merchandise were commonly and generally employed in the manufacture of metal cement used to fill holes in castings and repair breaks; that this cement was largely sold, but not in large quantities, because a small quantity filled the commercial requirements therefor.

Mr. Morgenroth, another of the Government's witnesses, who testified January 18, 1912, said he had been using size 6 of either the globular or angular merchandise (the record is not clear which, although from a sample produced by him we think it was the globular) in making cement for the last three years; that he had purchased a ton a month of the Harrison Supply Co. and had used it for that purpose and was continuing such use of that or similar merchandise.

Another witness, Mr. Klein, called by the importers, also testified that sizes 6 and finer of either the angular or globular merchandise were used and adapted to use in the manufacture of a metal cement called "metal crete," which was used by contractors and builders "to make indestructible, or to add to the strength of a concrete floor topping; and also for binding old and new concrete; also for waterproofing walls." From this testimony it appears that this par-

ticular commodity had been manufactured by the company in which he was interested, beginning about 1910 or 1911.

The Government met the evidence hereinbefore referred to by that of various witnesses who testified in substance that the only uses to which either the globular or angular merchandise was practically applied, so far as they knew or could learn, was that of an abrasive; that the globular merchandise was not suitable for use in counterpoise scale balances; and that only the angular form was suitable for making cement.

In its brief and arguments the Government's counsel criticizes the evidence of Mr. Harrison, because, he says, and the record so shows, that in his testimony Harrison failed many times to give precise dates, figures, quantities, and sizes relating to any transaction in the merchandise, so that investigation might be made as to the truthfulness of his statements in that regard, and, especially, did not give the names of his customers. Upon this subject we have examined the record with much care. Therefrom it appears that early in the hearings Mr. Harrison, when first on the stand, disclosed the fact that he was and had been selling the globular merchandise to the Fairbanks Scale Co. in one and two ton lots. Later in the hearings the purchasing agent of this company, Mr. Horton, before referred to, was called on behalf of the Government and he gave evidence tending to show that the use of the merchandise in filling the counterpoises of scales was not satisfactory to that company; that it did not contemplate its continued or further use for that or other purposes. Of course, the tendency of and the purpose in introducing this evidence was to rebut the claim that for use in counterpoise scale balances this shot had a practical commercial use. Later in the hearings, however, it was conclusively shown that, although the Fairbanks Scale Co. had discontinued purchasing the globular merchandise from Mr. Harrison, it had begun and was continuing the purchase of the same class of merchandise made in this country from one of his competitors, and was using and intending to use the same in the counterpoise balances of the scales, just as it had used that purchased from Mr. Harrison. Not only this, but, in addition, the company had given orders that the size of the counterpoise cups of certain scales be enlarged, where necessary, to facilitate such use. This loss of business was the result of Harrison's disclosure of the name of a customer, coupled with the fact that he could not compete with the domestic product and pay the duty assessed under paragraph 133. It is not the only instance shown in the record where similar results followed his mention of a patron's name. Either because he feared, expected, or had learned of such consequences, when Harrison was asked, upon the stand, to give the names of customers and amounts and dates of sales to them, he

sometimes objected or declined to do so. The record, however, shows, so far as we are able to learn therefrom, that upon each of these occasions he coupled his refusal to give the information asked for by offering to furnish it to the board or to counsel for the Government or to permit the latter to examine his books, from which it could be obtained. The board was not asked to order, nor did it order, the production of his books, but more than once the general appraiser presiding at the taking of the evidence ruled, in substance, when this question was up, that, in view of the fact that his competitors were present, the witness need not give the names of his customers or produce his books. All parties seem to have accepted this as the proper procedure, and it does not appear whether in fact the Government counsel examined the books.

We think, under these circumstances, that the evidence of Mr. Harrison loses none of its natural probative effect.

The legitimate tendency of the importers' evidence is to the effect that, prior to the enactment of the tariff act of 1909, the globular merchandise to the amount of some tons had been and was in use in weighting the counterpoises of scales, which use continued to the date of these importations and thereafter; that size number 6 of that merchandise and sizes 6 and finer of the angular product were likewise then and thereafter employed in the manufacture of metal cement used for filling blowholes and repairing iron castings; and that later there developed an allied use of the same in the manufacture of a product known as "metal crete," which seems to require greater quantities of the imported merchandise than are used in the manufacture of the metal cement. These uses are concededly nonabrasive.

The testimony of witnesses introduced by the Government that nonabrasive uses of the merchandise were unknown to them or that both classes thereof were, so far as they knew, used only as abrasives does not meet the probative effect of importers' evidence, because the importers' evidence shows *affirmatively* these uses, while the Government's evidence does not *disprove* the same.

The Government, while not really conceding these premises, asserts that if the uses claimed by the importers are found to exist, nevertheless they do not operate to exclude the merchandise from dutiability under paragraph 133, because it is urged that such uses are not practical or commercial or in sufficient quantities to establish that it has uses other than as abrasives within the meaning of the paragraph.

We agree that, under the language of paragraph 133, it must be found that the merchandise here can be used for and has practical, substantial, and commercial uses for purposes other than as abrasives, and that an occasional, experimental, or unusual use is not

sufficient to exclude it from classification thereunder.   This does not mean that the statute should be construed as if it read "that can be used chiefly as abrasives" instead of as enacted, for then the question of *chief* use would be the statutory test.

We think the record here shows without controversy that the globular merchandise was prior to the act of 1909, and since, regularly sold in ton lots and used in the filling of counterpoise scale balances; that prior to said date and since the finer sizes thereof were likewise sold in substantial, if not in ton, lots and regularly used in the manufacture of metal cement; that the finer sizes of the angular merchandise before and since said date were also used in substantial amounts for the same purpose.   It was the duty of the board to have so found.

We are also of opinion that these uses in these amounts are practical, substantial, and commercial uses of the merchandise for purposes other than as abrasives and are not occasional, experimental, or unusual.   As to whether the use of the globular merchandise in the washing of bottles, which is clearly established, though indefinite in quantity, would suffice to take the merchandise out of paragraph 133, we do not determine, although we incline to the view that such is not an abrasive use.

From this it follows that the protests should not have been altogether overruled.

It is said by the Government that the record shows that the importations of one of the parties here are, in fact, used only as abrasives and that such merchandise should be classified under paragraph 133.   It is then argued upon that premise that the other importations should be likewise classified in order to accomplish a uniform taxation of the same article, that concededly being one of the acknowledged principles of tariff classification.

The latter result, however, is attained by the conclusion we have reached; and the importations of this particular importer, so far as they are of the grades held not to be dutiable under paragraph 133, being interchangeable with those of equivalent sizes of the other importations here involved, are equally susceptible of uses other than as abrasives, and so are not within the meaning of the paragraph.

It is considered and adjudged therefore upon the record that the globular merchandise of the sizes 1C, 1, 1F, 2C, 2F, 3, 4C, 4F, 5, and 6, manufactured by Harrison Bros., and equivalent sizes of other manufacturers, and sizes 6 and finer of the angular merchandise manufactured by Harrison Bros. and equivalent sizes made by other manufacturers, which are the subject of protest in this case, are not dutiable under paragraph 133, but are dutiable under paragraph 199 of the act of 1909, and the judgment of the Board of General Appraisers is *reversed* as to such merchandise.   As to any other merchandise the subject of protest here, the judgment of the Board of General Appraisers is *affirmed*.