(C. D. 756)

R. W. Greeff & Co., Inc. *v.* United States

United States Customs Court, First Division

(Decided April 2, 1943)

*Eugene R. Pickrell* for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Marcus Higginbotham, Jr.*, and *John J. McDermott*, special attorneys), for the defendant.
*Barnes, Richardson & Colburn* (*Joseph Schwartz*), amicus curiae.

Before Oliver, Walker, and Cole, Judges; Oliver, P. J., not participating

Cole, Judge: The merchandise involved in this suit is known as iron by hydrogen. It derives its name from the method by which it is obtained. Oxide of iron is reduced in a suitable furnace by hydrogen gas, removing the oxygen in the form of water and leaving metallic iron in powdered form with slight impurities, similar to the product before us.

The collector of customs assessed duty on the merchandise at the rate of 25 per centum ad valorem under the Tariff Act of 1930, paragraph 5, (19 U. S. C. 1940 ed., sec. 1001, par. 5) as a medicinal preparation. Plaintiff claims that it is properly classifiable, either under paragraph 335, providing for "Grit, shot, and sand of iron or steel, in any form, three-fourths of 1 cent per pound," or under the provision in paragraph 301 for "granular or sponge iron, $2.25 per ton."

Identical merchandise was before the court in the case of *R. W. Greeff & Co.* v. *United States*, 2 Cust. Ct. 679, Abstract 41155. Although the issue in that case was somewhat different from that presented herein, the record was incorporated in the instant case, by consent of the parties. There, the merchandise was assessed as a

chemical compound and the claim was limited to paragraph 335, *supra*. The court found from uncontradicted testimony, that the chief use of the merchandise was for medicinal purposes and overruled the protest. The effect of this ruling was to retain the merchandise under paragraph 5, but as a medicinal preparation, the classification in dispute here.

At the outset, it is important to emphasize the well-settled rule that the burden on a plaintiff in a classification case is twofold: first, it must be shown that the collector's classification was wrong, and then the correctness of the alleged claim must be established. *United States* v. *Albrecht*, 27 C. C. P. A. 112, C. A. D. 71. To meet the first obligation, it is essential that competent evidence be offered disproving, *prima facie* at least, the classification fixed by the collector.

The classification, "medicinal preparations," under which the instant merchandise was classified, is one determined by the use to which the merchandise is put, and the controlling factor is chief use. *Scharf Brothers Co., Inc.* v. *United States*, 25 C. C. P. A. 32, T. D. 49038, and *United States* v. *William Cooper & Nephews, Inc.*, 22 C. C. P. A. 31, T. D. 47038. The latter case discussed with such clarity and force the soundness of this doctrine, we quote at length therefrom:

In view of the fact that the Congress has required the application of the test of chief use to the drug paragraphs of the act, we can see no reason, so far as the test of use is concerned, for not applying the same test to the provision for medicinal preparations contained in paragraph 5. See *Monticelli Bros. et al.* v. *United States*, 8 Ct. Cust. Appls. 21, T. D. 37162. Both medicinal preparations and drugs, according to the statutory meaning of those terms, have therapeutic or medicinal properties, and both must be used for the prevention, cure, or alleviation of bodily disease of either man or animal. See *United States* v. *Nagase et al., supra* [11 Ct. Cust. Appls. 144, T. D. 38939].

\* \* \* .\* \* \* \*

In the case of *Fink* v. *United States, supra* [170 U. S. 584], the Circuit Court of Appeals, Second Circuit, stated in a certificate to the Supreme Court of the United States that "The commercial meaning of the term 'medicinal preparation' is the same as its ordinary meaning, viz, a substance used solely in medicine and prepared for the use of the apothecary or physician to be administered as a remedy in disease." The questions which the Circuit Court of Appeals propounded to the Supreme Court in that case related to the proper dutiable classification of muriate of cocaine. In answering those questions, the court, among other things, said:

Being a medicinal preparation, made as such and solely used as a medicine, the language of paragraph 74 clearly more definitely applies to it than does the generic provision "of chemical compounds and salts" found in paragraph 76. *Magone* v. *Heller*, 150 U. S. 70; *Robertson* v. *Salomon*, 130 U. S. 412.

It has been suggested that the Supreme Court held in that case that a medicinal preparation was one used solely as a medicine. It is evident, we think, that the Supreme Court did not so hold. It merely accepted, for the purpose of answering the questions propounded to it, that a medicinal preparation, both as commonly

and commercially understood, was a "substance used solely in medicine * * *." Furthermore, it is evident, we think, from the certificate of the Circuit Court of Appeals that its definition of the term "medicinal preparation" was based upon the testimony in that case. But, however that may be, we are of opinion that the same test of use—chief use—should be applied to the provision for "medicinal preparations", contained in paragraph 5 of the Tariff Act of 1930, as the Congress has required, by the provisions of paragraph 34, shall be applied to the drug paragraphs of that act.

Being an *eo nomine* provision that suggests use, it is chief use at the time of enactment of the tariff act that determines whether an article is properly classifiable as a medicinal preparation. This rule is very clearly set forth in *United States* v. *F. W. Myers & Co., Inc.,* 24 C. C. P. A. 464, T. D. 48913, wherein the court said:

The term *newsprint paper* is an *eo nomine* provision. It indicates the use to which the paper is put. "Standard newsprint paper" is also an *eo nomine* designation and suggests its use. The particular kind of newsprint paper free listed was "Standard newsprint paper."

Under the well-settled rule of this and other courts, an *eo nomine* designation, the meaning of which is in question, must be determined as of the date of the passage of the act. In determining the meaning of a word which meaning depends upon its use, it has always been the law that proof of that use is confined to the time prior to and on the date of the passage of the act in which the term is used. In other words, what did the term mean when Congress used the same? *Goldsmith's Sons* v. *United States,* 13 Ct. Cust. Appls. 69, T. D. 40932; *Wilbur-Ellis Co.* v. *United States,* 18 C. C. P. A. (Customs) 472, T. D. 44762.

The same principle was enunciated by our appellate court in its later decision *United States* v. *C. J. Tower & Sons,* 26 C. C. P. A. 1, T. D. 49534, and this court followed it in an opinion by Judge Walker in the recent case of *Purepac Corporation* v. *United States,* C. D. 722, construing the provision for "lubricating oil" as used in the Revenue Act of 1932.

The case of *United States* v. *Roessler & Hasslacher Chemical Co.,* 79 Fed. 313, which arose under the Tariff Act of 1890 and is cited by counsel for plaintiff in his brief, was in effect overruled by the decisions referred to above, which are the latest expressions of the court, controlling judicial interpretation of the provision for "medicinal preparations."

The foregoing review of well-settled principles of tariff construction has been set forth as a foundation for the discussion of the testimony on "use."

The collector's classification of the merchandise as a medicinal preparation carries the presumption of its chief use as such, as of the time of enactment of the Tariff Act of 1930. *Joseph Schmidt, Inc.* v. *United States,* C. D. 690. Unless, therefore, plaintiff establishes chief use, at that time, for purposes other than medicinal, its entire case must fall.

In determining such use, evidence regarding experimental work, to which much of plaintiff's testimony is addressed, is immaterial. We are concerned only with the use of the commodity for practical commercial purposes. *Harrison Supply Co.* v. *United States,* 6 Ct. Cust. Appls. 72, T. D. 35326.

Plaintiff's testimony relating to use was offered principally by a consulting chemical engineer, who, from 1922 until 1937, was a professor of chemical engineering at Pratt Institute, in the engineering school. During his professorship, in 1922, he evidently participated in an investigation of the production of iron by hydrogen in connection with work on Bolivian ore body of various materials. To what extent he individually so participated is not disclosed. The witness referred to later work in the years 1926 and 1928 but when it was obvious that such experience, whatever it was, resulted from association with others, he was directed by counsel to confine testimony to himself. In attempting to do so he related his individual experience in the production of iron by hydrogen in the following language:

I reinvestigated commercial producing methods for iron by hydrogen as competitive materials or competitive methods for electrolytic irons and other mechanisms for producing the required materials. That development has grown quite rapidly, and since 1936 I have been a director of a company which is devoting its entire energies in the field of powder metallurgy and the application of iron powders, and iron sand, and related materials.

Between 1936 and 1938, the witness conducted surveys with a view of determining "on what scale plants should be designed and projected" to provide for "all possible market uses and the consumption of iron by hydrogen." Based upon these surveys, the witness testified that the industrial use of the merchandise, in 1937, predominated over its application for medicinal purposes.

When he was first asked to express an opinion as to the annual consumption in this country in June 1930, of iron by hydrogen for industrial uses other than the manner of production of medicinal preparations and answered, "I can only make a vague estimate of the amount at that time," the court, very properly, sustained an objection to a further question asking him what the estimate was, because he was clearly not qualified. The witness was further interrogated, evidently for the purpose of qualifying him to meet the objection openly expressed by counsel for defendant that his knowledge of the subject at the time of enactment and prior to the passage of the Tariff Act of 1930 was the test, but in answering questions propounded by counsel and also by the court, he disclosed little association or familiarity with conditions in 1930. The witness, nevertheless, was permitted to testify that the "relative proportions of the use of iron by hydrogen for industrial purposes other than for the manufacture of medicinal

preparations in 1930" was "about 40 or 50 tons a year," and that this "was probably larger than the medicinal uses." The witness' utter lack of knowledge of conditions in 1930 is reflected in the following two questions and answers which developed in the course of his cross-examination:

X Q. In other words, your first survey of the use of merchandise like Exhibit 1 was in 1936; is that right?—A. Yes.

\* \*. \* \* \* \* \*

Judge DALLINGER. Did you find out how many tons were used? You said 50 tons were used for industrial purposes. Did you make any survey and get any data as to how many tons were used for medicinal purposes?

The WITNESS. The medicinal use was in 1936—our estimate was less than 40 tons. 1930, I don't know.

The foregoing testimony concerning "use" as of the time of enactment of the Tariff Act of 1930 and prior thereto—the period with which we are concerned—is vague, indefinite, and unsupported by convincing qualifying experience. His evidence therefore, is not entitled to sufficient probative value to warrant a positive finding on chief use to support plaintiff's contention. Additional testimony, offered to show the use of the product in manufacturing operations, referred to periods subsequent to 1930. We do not regard any of this testimony as material in determining the issue as we have defined it.

In addition to uncontradicted testimony in the incorporated record establishing a principal use for medicinal purposes, two witnesses, connected with medicinal chemical manufacturers, testified that for the past 15 to 20 years a very large percentage of their output of iron by hydrogen was sold to druggists, pharmaceutical manufacturers, and hospitals. This testimony far outweighs any attempt to prove otherwise. It is true that one of defendant's witnesses testified that in 1937 his production of iron by hydrogen for industrial purposes exceeded that for medicinal uses, but he further stated that in 1930 he was not producing the merchandise. This is further indication that no suitable commercial use was developed until after 1930.

On this record, plaintiff has not overcome the presumption of correctness attaching to the collector's classification of the instant merchandise as a medicinal preparation and its chief use as such at the time of enactment of the Tariff Act of 1930.

In the view thus taken, it is not necessary to discuss the testimony at length. The court has read the ably prepared briefs submitted by counsel for plaintiff, defendant, and amicus curiae, and has done so with interest and profit. Our study of the testimony, of which there is considerable, leads convincingly to the following conclusions which we are stating because of their bearing on the judgment to be rendered herein.

Grit, shot, and sand of iron, one of the classifications sought by plaintiff, are produced from a mixture of pig iron, scrap iron, coke, limestone, and certain alloys melted in an ordinary foundry cupola. The molten metal is led into a number of small streams where it is broken into small round particles which are dropped into water and chilled. Removed from the water tank, they are given heat treatment, then screened into different sizes, and finally the very coarse grains are subjected to further crushing and rolling. The ultimate products differ only in their degree of coarseness. In chemical composition, physical appearance, and use, they also differ from iron by hydrogen. The latter is a fine powder, containing no carbon, and whose particle size is consistently smaller than the commodities referred to, all of which have sufficient carbon content to give a certain hardness, making them available as abrasives for which they are chiefly used.

Granular or sponge iron, another classification included in the claims alleged by plaintiff, is a so-called end product, comparatively coarse, obtained from the reduction of high-grade iron ore, or magnetite, by carbonaceous material, and always containing certain chemical constituents natural to its source. Hence, it is basically different from iron by hydrogen.

The physical and chemical characteristics of iron by hydrogen make it available for certain uses that further distinguish the product from any of those analyzed by plaintiff and to which we have referred. Its fine, powdered texture makes suitable polishing material. Its therapeutic properties provide practical pharmaceutical use. Its permeability and electric characteristics give it commercial usage in different manufacturing industries. It also has use with other powders to form alloys employed in the production of various mechanical items. For a description of its use in the manufacture of articles, we can find no better expression than this statement by the plaintiff:

It is for the manufacture of articles to exacting dimensions by processes which are similar to that employed in plastics, where a metal powder is placed in a mold and the powder compressed to conform to the die. The piece is then heat treated or sintered and becomes a finished part without the necessity of machining or further processes. Alloyed parts are made in a similar way by mixtures of powder.

The same cannot be said for any of the classifications advanced by the importer.

Iron by hydrogen is a separate and distinct commercial product with peculiar properties that have developed its use in industrial fields subsequent to the passage of the Tariff Act of 1930.

The protest is overruled and the decision of the collector is affirmed. Judgment will be rendered accordingly.