(C. D. 1023)

C. J. Tower & Sons *v.* United States

United States Customs Court, First Division

(Decided September 13, 1946)

Barnes, Richardson & Colburn (*Joseph Schwartz* of counsel) for the plaintiff.
Paul P. Rao, Assistant Attorney General (*Dorothy C. Bennett* and *Richard E. FitzGibbon*, special attorneys), for the defendant.

Before Oliver, Cole, and Mollison, Judges

Cole, Judge: The Norton Co. of Chippawa, Canada, exported to its parent company, the Norton Co. of Worcester, Mass., a shipment of merchandise invoiced as "Crude Artificial Abrasive (#38 Alundum)." Plaintiff, a customs brokerage firm, entered the goods at Buffalo where the collector of customs classified the same as refined bauxite under paragraph 6 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1001, par. 6), assessing duty thereunder at one-half of 1 cent per pound. Plaintiff's principal claim is for free entry of the shipment under the provision in paragraph 1672 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1201, par. 1672) for "crude artificial abrasives, not specially provided for."

It is immediately important that we examine the somewhat lengthy testimony offered by both sides. For the plaintiff, four witnesses testified, three of whom were employees of the Canadian manufacturer and exporter. We now reduce their testimony to a factual summation.

The office manager stated that his employer manufactures crude abrasives which are divided into two categories; i. e., aluminous

abrasives and silicon carbon abrasives; that the term "Alundum" is used by the company to designate its aluminous abrasives; and that the instant merchandise, which had no commercial use until 1939, is identified as "38 alundum in pellet form," as distinguished from the other form of "38 alundum" which has been produced and exported in chunks or lumps since 1926. All of the manufacturer's production of the imported material is sent to the parent company in Worcester, Mass., where "it has to be treated and crushed and sized."

The head of the developing section of the research laboratory is responsible for development of the process by which the merchandise in question is manufactured. The raw material, purchased from the Aluminum Co. of America, is "Bayer process alumina," a highly purified, white, sugary-like substance derived from refined bauxite. It is aluminum oxide in a very pure form containing "a minor amount of soda, trace of titania, about three-hundredths of a per cent of iron. Altogether the total alumina content would add up something in excess of 99.5 per cent."

The "Bayer process" alumina is fed into a water-cooled furnace shell (Higgins type) to which a small amount (one-quarter of 1 percent of the furnace charge) of petroleum coke is added, and the mixture is fused by direct arc means. The resulting liquid is subjected to a quick-cooling process by being poured into a stream of high velocity cold water, producing the imported pellets which, without further processing, are sent to the Norton Co. of Worcester where, after further crushing, they are "hydro-classified, ball milled, acid treated, calcined, and sized."

The imported pellets were characterized as "a minor variation of our 38 alundum," an identification which was clarified by statements to the effect that "38 alundum" is manufactured largely in lump form. Chemically, the constituent elements in both pellets and lumps are substantially the same, the principal difference between the two types being their physical structure. The imported material was produced experimentally during 1918 and again during 1939, but production in commercial quantities was not developed until the spring of 1940.

The chief chemist at the Canadian exporter's plant testified that the imported pellets are produced from refined bauxite, known as "Bayer process" alumina, which is "processed in the furnace, poured, and cooled." His quantitative analysis of the material in question revealed the following constituents:

The silica, $SiO_2$, was .10 per cent; the iron content, $Fe_2O_3$ was .04; the titania content, $TiO_2$, was a trace, and the alkali or soda content, $Na_2O$, is .02 per cent. The balance of the material was aluminum oxide.

The material is essentially aluminum oxide, being "recrystallized aluminum oxide," possessing the same constituent elements now that it had before being rendered into the form of pellets. .

The assistant director of research of the Norton Co. of Worcester, by whom the imported merchandise was finally received and processed for ultimate use in this country, also testified on behalf of plaintiff. He became associated with the company in 1916, having worked since then in the research laboratory, developing the application of microscopic techniques toward the study of abrasives, abrasive products, and refractors. The duties of his present position as supervisor of the research laboratories bring him in close contact with the manufacture and sale of the Norton Co.'s products, and necessarily require a thorough familiarity with the materials used by his company, the kind of products sold, the nature of the customers' business, and the use to which his products are put.

According to this witness, Mr. Abraham Albert Klein, the Norton Co. of Worcester manufactures abrasives, abrasive products, refractory materials, wear-resistant materials, and various types of grinding machines. It divides its abrasives and abrasive products into three categories, each of which is designated by a trade name; i. e., fused alumina abrasives, "Alundum"; a silicon carbide abrasive, "Crystolon"; and a boron carbide abrasive, "Norbide." The aluminous abrasives, "Alundum," are further classified, according to the degree of purity of aluminum oxide, as "Regular Alundum," "57 Alundum," and "38 Alundum," the last being the purest.

The instant merchandise is a subdivision of "38 Alundum" and is identified as "E–163" or "38 Alundum Low Soda." It is synthetic aluminum oxide, made out of Bayer process alumina, fused in an electric furnace, and tapped into a stream of water that quickly chills it. The imported material is not refined bauxite because Bayer process alumina (refined bauxite) has been changed to some extent in its chemical composition by lowering the sodium oxide content "but more particularly from the physical state because it has produced a material with a range of crystals and with the type of crystal shape that is necessary for the commercial use of the final product made from it." The heating process imparts to the Bayer process alumina desirable properties for its ultimate use as an abrasive or a refractor.

The merchandise in question is the only kind of "Alundum" produced in pellet form; all others are made in lump form. The pellets are slightly purer, chemically, than the lumps, but the important difference is in the physical nature of the alumina crystals. The pellets are recognized as crude material because they are of no use in their imported form.

As of June 17, 1930, the date of enactment of the Tariff Act of 1930, "Regular Alundum" and "38 Alundum" were chiefly used for

abrasive purposes, but "57 Alundum" had not been developed as a commercial abrasive. The merchandise in question, "E–163" or "38 Alundum Low Soda," existed, prior to passage of the Tariff Act of 1930, only as experimental material and was not developed for commercial usage until 1940. Since then, it has been used entirely in the production of a material chiefly used "as a coating for the heaters which are in radio tubes," and having "a minor use as a fine abrasive material." The value of the finished product as a refractory material and as an abrasive lies in the "hardness" of the raw material, Bayer process alumina. Processing of the imported pellets for their ultimate use was described as follows (R. 60):

Well, it comes in the form of these pellets (indicating) as you see them. And then it has to be milled down to the size of the two products which are made from it, namely, a material known as 38500 and 38900. That is accomplished by putting it through a ball mill continuously operated, and then through a hydro-separator which produces an overflow material and an underflow material. The underflow material is returned back to the ball mill for further milling; the overflow material goes into a larger hydro-separator or classifier and is split off into two products, the coarser of which is 38500 and the finer 38900. The overflow goes over to a third hydro-separator where we have another split which is 38900 and then the material from the separators from which the 38500 and the 38900 come—each of them go through acid-treating tanks in which 30 per cent sulphuric acid, warm, is introduced, the purpose being to remove from the materials impurities, largely iron, which were introduced in the ball milling. From there the two products go into thickeners in which the liquid is separated from the solid. From there the solid material goes into containers, is dried, and then goes into ceramic kilns heated to approximately 800 degrees centigrade, the purpose of this being to remove any traces of remaining acid, and the material then is put over a scalping screen and then is ready to be sold.

The resulting materials, designated by the manufacturer as "38 Alundum flours, referred to as 38500 and 38900 acid treated," are of uniform particle size; the coarser, No. 38500, being 19 microns; and the finer, No. 38900, being 7 microns. (A micron is a thousandth of a millimeter.) The witness testified as follows concerning the purpose of such refractory materials:

X Q. And that is used to coat the wires in radio tubes where they go down into the socket, is that right?—A. That's right.

X Q. So that no heat will be generated that will melt that socket, is that right?—A. Well, the purpose of it, as I understand it, the wire is to heat the cathode and the wire must have the coating on that there, remain intact so that there will be no electronic emission from the wire itself. It must be an impervious coating at the temperature at which the wire is heated.

The original request for the two refractory materials came from radio-tube manufacturers who wanted "a high purity fused alumina product of well classified and fine particle size for developments that they had," so "I set up the specifications for 38500 and 38900 with the R. C. A. Company here in New Jersey and, of course, in those days it was before we made this material from this pellet form. In

those days we made it from the lump form. We set down those specifications which have not been changed in all these years for 38500 and 38900. I then worked with a gentleman named Shadlow of the R. C. A. Company, who is currently still there." The specifications referred to dictate the use of the material for refractory purposes. The instant merchandise, "E–163" or "38 Alundum Low Soda," is the only item of "Alundum" produced in the shape of pellets; all others are manufactured in lump form.

A Government chemist analyzed a sample of the imported pellets and presented defendant's exhibit 2, reading as follows:

The sample consists of approximately 98% aluminum oxide, 1.5% silica, 0.4% loss on ignition, and a trace of iron.

In our opinion, aluminum oxide with small amounts of impurities.

Defendant also introduced, through the chief chemist of the United States Customs Laboratory in New York, a letter from the Norton Co. of Worcester, Mass., corroborating plaintiff's testimony concerning the processing of the merchandise in this country and its chief use as a refractory material.

Defendant argues that C. J. Tower & Sons v. United States, 24 C. C. P. A. 332, T. D. 48769, is controlling. In that case, the merchandise was invoiced as "Bauxite Ore Concentrates Grade 'H' Leached, Unground," and was found by chemical analysis to consist of "99.31 per centum aluminum oxide, the remaining elements, or 'impurities', consisting of small percentages of silica, iron oxide, and titanium oxide."

The collector classified the merchandise as an earthy or mineral substance under paragraph 214 of the Tariff Act of 1930, assessing duty at 30 per centum ad valorem, and the importer claimed classification under the provision in paragraph 6 of the Tariff Act of 1930 for "Aluminum hydroxide or refined bauxite, one-half of 1 cent per pound."

It was shown by the record that the "imported product was produced in an electric furnace by what is known as the metallurgical process," and one of the importer's expert witnesses testified that the product "is aluminum oxide, and that the only chemical difference between it and aluminum hydroxide is that the latter contains water; that 'with that exception they are one and the same thing'."

In sustaining the importer's claim, the court reviewed legislative history, concluding in effect that "aluminum hydroxide or refined bauxite," as used in said paragraph 6, are not synonymous terms, but that the former is merely one form of the latter, and that aluminum oxide, another form of refined bauxite, is also included therein for tariff purposes.

It is true that the merchandise in question is substantially the same, so far as constituent elements are concerned, as that involved in the

*Tower* case, *supra*. The present case, however, presents an issue which was not before the court in the cited one. Here, the merchandise was classified under the provision which the court found applicable to the goods involved in the said *Tower* case, but plaintiff herein unlike the importer in the cited case, seeks free entry for the merchandise under the provision for "crude artificial abrasives, not specially provided for," claiming that such provision is predicated on "use" and therefore takes precedence over the *eo nomine* designation under which it was classified by the collector. In other words, the element of "use," not involved in the previous case, has been injected herein, thereby materially distinguishing the two cases.

The following definition of abrasive (Webster's New International Dictionary) supports the conclusion that "use" is a highly important influence in plaintiff's claim:

**abrasive,** n.   Any substance used for abrading, as for grinding, polishing, etc. It is often made into grinding wheels with a binder, or attached to paper or cloth with glue.   The principal natural abrasives are *emery, corundum, garnet, pumice, tripoli,* and *quartz sand.* The principal manufactured abrasives are *silicon carbide* and fused *aluminum oxide.*

Prior to enactment of the Tariff Act of 1930, the material under consideration was used only experimentally, which is wholly immaterial for the purposes of this case.   *Harrison Supply Co. et al.* v. *United States,* 6 Ct. Cust. Appls. 72, T. D. 35326.   Its practical, commercial use was not developed until 1939 or 1940, long after passage of the tariff act.

Plaintiff admits these facts concerning experimental and commercial use but contends that classification as a crude artificial abrasive should prevail because the material in question "falls within a class of merchandise which was chiefly used for abrasive purposes on and prior to June 17, 1930." To state it more specifically, it is plaintiff's contention that "Alundum" was on and prior to June 17, 1930, a recognized class of merchandise chiefly used for abrasive purposes, and that the merchandise in question "38 Alundum Low Soda," belonging to such a general class, is subject to the same tariff classification.

*United States* v. *C. J. Tower & Sons,* 26 C. C. P. A. 1, T. D. 49534, is cited in plaintiff's brief to support the proposition. In that case, the merchandise consisted of paper, imported in rolls 15 inches wide, and which was used in printing newspapers. The collector classified the merchandise under the provision for "all uncoated printing paper, not specially provided for" in paragraph 1401 of the Tariff Act of 1930, and the importer claimed that the paper should be admitted free of duty as "Standard newsprint paper," under paragraph 1772 of the Tariff Act of 1930. The claim for free entry was denied because the merchandise was not within the class of paper chiefly used for the

printing of newspapers as of the time of enactment of the Tariff Act of 1930.

The same rule was expressed in the earlier decision of *United States v. Belgam Corp. et al.*, 22 Ct. Cust. Appls. 402, T. D. 47402, a case which arose under the Tariff Act of 1922. There, the merchandise consisted of white and colored cotton rags which, on the dates of their importation, were concededly used as wiping rags. Some of the merchandise was classified as articles, manufactured in whole or in part, not specially provided for, under paragraph 1459, and the remainder as waste, not specially provided for, under paragraph 1457. All of it was held to be free of duty as paper stock under paragraph 1651, upon a finding that the rags in question were of the character that were chiefly used for paper making at the time of enactment of the Tariff Act of 1922.

The two cases just referred to are authority for the principle that a tariff provision predicated upon use includes all merchandise of the class which, at the time of passage of the tariff act, was chiefly used for the purpose suggested in the provision. Thus, the question before us is whether "Alundum," a class of merchandise chiefly used for abrasive purposes on and prior to June 17, 1930, is within the statutory provision for "crude artificial abrasives" invoked by plaintiff. If so, then under the last two cited cases, the instant merchandise is also included therein.

*Harrison Supply Co. et al. v. United States, supra,* made the following comment concerning the provision for "crude artificial abrasives" as it appeared in paragraph 432 of the Tariff Act of 1909:

It will be noticed that the part [crude artificial abrasives] relied upon by the importers follows provisions for manufactured, ground, pulverized, or refined emery, and manufactures of which emery or corundum is the component material of chief value. The term "artificial abrasives" implies an abrasive product resulting from some processing or treatment, and the word "crude" implies that such artificial product must be in a crude condition.

\*       \*       \*       \*       \*       \*       \*

It might well be argued that the term "crude artificial abrasives," as employed in paragraph 432, contemplates an artificial abrasive that has not, by manufacturing, grinding, pulverizing, or refining, been reduced to small particles, such as "grains." In other words, that it relates to an artificial abrasive imported in larger units or cruder forms than grains or the grades in the case at bar.

The merchandise in question, "38 Alundum Low Soda," is Bayer process alumina (refined bauxite) which has been processed and treated to acquire abrasive properties, resulting in the imported pellets. They are not in form or condition for any use, but require additional processing of substantial preparation to become available for ultimate use. Hence, they are in a "crude" state, within the

tariff meaning of the term. *United States* v. *United States Rubber Co.*, 31 C. C. P. A. 174, C. A. D. 269.

While the instant merchandise is in fact a crude material with abrasive qualities, its classification under the provision for "crude artificial abrasives" in paragraph 1672, *supra*, depends entirely upon a positive finding that "Alundum," the general class of which the material before us is a division, was recognized as such at the time the present tariff act was passed.

We find such recognition in the "Summary of Tariff Information, 1921," a compilation prepared by the United States Tariff Commission for the Committee on Finance of the Senate. It contains pertinent information concerning the "Fordney Bill" (H. R. 7456), finally enacted as the Tariff Act of 1922. The volume embodies descriptive and economic data on commodities mentioned in the bill, covering description and uses of the articles. Page 1120 of the document has the following important disclosures under the heading of "ARTIFICIAL ABRASIVES":

*Description and uses.*—Artificial abrasives are of two kinds (1) silicon carbides, sold under the trade names of carborundum, crystolon, and carbolon; and (2) aluminum oxides, sold as alundum, aloxite, exolon, and lionite. Artificial abrasives sold under other names are either the above products ,or are imported materials marketed under special trade names. Carbide of silicon is the best abrasive for use on cast iron, brass, bronze, and other metals of low tensile strength, and marble, granite, pearl, leather, and carbon. It is also used in the form of bricks as a refractory in furnace construction. Oxide of aluminum is the best abrasive for grinding steel and wrought iron. It also has found considerable use as a refractory and filtering medium. These artificial abrasives, by far the most important abrasive materials, have replaced emery and corundum to a large extent.

The foregoing reveals very clearly that as far back as 1921 the lawmakers knew of "Alundum" as an artificial abrasive, and its specific mention in the above quotation lends much support to the conclusion that it is one of the "crude artificial abrasives" contemplated by the paragraph under consideration.

The consistent recognition by legislators of "Alundum" as an artificial abrasive is revealed in the following excerpt from the "Digests of Trade Data" prepared by the United States Tariff Commission (1938) in connection with the "Second Trade Agreement between the United States and Canada":

Synthetic abrasives of silicon carbide (carborundum, crystolon, carbolon, electrolon) and of aluminum oxide (alundum, aloxite, exolon, lionite) are made in considerable tonnage at Niagara Falls, N. Y., and Worcester, Mass., and are also either made or processed in Conniston, Ala., Blazedell and Troy, N. Y., Littleton, N. H., and Perth Amboy, N. J. There were five plants in the United States in 1930 and eight plants in 1934. The expiration of patents on these electric furnace products has widened the field of producers and permitted sharper competition with the natural abrasives. The principal American manufacturers also operate

plants in Canada and Europe. The Canadian plants send the greater part of their crude output to affiliated plants in the United States for crushing, cleaning, and grading.

The above quotation follows a general statement in the same document which includes this comment:

Crude artificial abrasives include: (1) metallic abrasives, dutiable under tariff paragraphs 334 and 335, such as crushed steel, steel shot, and steel wool; (2) metallic carbides, chiefly tungsten carbide; and (3) synthetic aluminum oxide and silicon carbide. The latter two abrasives and possibly a few others are the crude artificial abrasives comprising the classification "not specially provided for" under paragraph 1672.

There, again, is direct reference to an identification of the present merchandise, "synthetic aluminum oxide," as a crude artificial abrasive.

Plaintiff's uncontradicted testimony, establishing the shipment in question as a form or kind of "Alundum," coupled with the positive knowledge before lawmakers, as revealed in the foregoing review of official documents, that "Alundum" was, at the time of enactment of the tariff act, a class of crude artificial abrasives, is sufficient to bring the material in question within the provisions of paragraph 1672, *supra*, and therefore entitled to free entry, as claimed.

In view of this conclusion, it is unnecessary to discuss plaintiff's alternative claim relating to a long-continued administrative practice, prior to the instant importation, of classifying "Alundum" in all forms under said paragraph 1672.

The protest is sustained and judgment will be rendered accordingly.