(C. D. 1024)

C. J. TOWER & SONS *v.* UNITED STATES

United States Customs Court, First Division

(Decided September 26, 1946)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Richard E. FitzGibbon* and *Dorothy C. Bennett*, special attorneys), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges

COLE, Judge: The Carborundum Co., manufacturers of all types of abrasive material, with a minor production of refractors, has used the word "Aloxite" since 1917 to designate its aluminous abrasives. The term is employed and recognized by the parent corporation in Niagara Falls, N. Y., and by the subsidiary in Niagara Falls, Ontario, Canada. Chemically, all items of "Aloxite" are the same; they differ only in physical structure. "Aloxite" is made out of bauxite, the final material consisting principally of alumina, which crystallizes into particles of various sizes. The crystals of alumina are cemented with a matrix, composed largely of titanium oxide with small amounts of iron oxide and silicon, thereby giving the material a certain degree of toughness and usability for abrasive purposes. When "Aloxite ' is produced in chunks or lump form, the molten mass is permitted to solidify in the electric furnace. When it is made in the shape of extremely fine crystals, the molten material is poured out of the furnace into a blast of air, where it is instantaneously cooled. All forms of "Aloxite" are chiefly used for abrasive purposes; a minor use is as refractory material. Such uses existed at and prior to the date of enactment, June 17, 1930, of the tariff act, and prevail at present.

The merchandise in question—classified as refined bauxite, with duty assessment at one-half of 1 cent per pound under paragraph 6 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. §1001, par. 6), and claimed to be free of duty under the provision in paragraph 1672 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. §1201, par. 1672), for "crude artificial abrasives, not specially provided for"—is a form of "Aloxite" composed of more than 95 per centum alumina, the remaining constituents being iron oxide, titanium oxide, silicon oxide, and calcium oxide, in varying small quantities. All of the ingredients impart to the material a definite characteristic enhancing its abrasive properties. It is produced by feeding into an electric furnace, calcined bauxite with a predetermined amount of carbon (coke), depending on the degree of reduction of impurities that is desired. The molten mass is poured out of the furnace into a blast of air and instantaneously cooled, producing an extremely fine abrasive material in the form of so-called "bubbles," especially adapted for the less-harsh class of abrasive operations. The imported material was not used commercially until

1942 and since then has been chiefly used as an abrasive for "putting very fine finishes on steel bearings and gun barrels, and things of that. type." For such use, it is crushed down into fine powder and graded into four different sizes from which the abrasive wheel or stick is manufactured.

The foregoing set of facts is supported by the testimony of two of plaintiff's witnesses, i. e., the chief chemist and the director of technical operations at the plant of the Carborundum Co., in Niagara Falls, N. Y., where the material in question was received from its place of shipment, the subsidiary corporation at Niagara Falls, Ontario, Canada.

Dr. Francis Frary, director of research for the Aluminum Co. of America and a well-qualified chemist, appearing on behalf of plaintiff, testified that bauxite is a mineral, occurring in nature, as aluminum hydroxide mixed with iron oxide, silicon oxide, titanium oxide, and other minor materials; that it is refined, is treated with a solution of caustic soda, dissolving out of it aluminum hydroxide, which is precipitated in solid form and then filtered and washed. It is sold as such or calcined in a heating process, resulting in substantially pure (more than 99 per centum) aluminum oxide, the material that is used in the aluminum industry for the manufacture of metallic aluminum. The merchandise under consideration is not suitable for such use because of the impurities—iron oxide, silicon oxide, and titanium oxide—which would tend to contaminate the metallic aluminum.

The material in question is produced from calcined bauxite mixed with a definite quantity of carbon (coke) to control the reduction of impurities. The amount of coke used will "reduce substantially all of the iron and almost all of the silica and very little of the titanium oxide." The mixture of calcined bauxite and coke is fed into an arc-like electric furnace and heated to a temperature "between four and five thousand degrees Fahrenheit," resulting in a molten slag of partially purified alumina. It acquires its pill-like or globular form, so-called "bubbles," by being poured from the furnace and passing a series of horizontal jets, which issue high pressure steam or air. To insure solidification, the "bubbles" are blown "perhaps fifteen or twenty feet" before falling to the ground. The imported material is a form of "partially purified bauxite," whose commercial value lies in its physical properties helpful to the abrasive industry.

Defendant offered two witnesses, employees of the refractory division of the Carborundum Co. at Perth Amboy, N. J., for the purpose of showing commercial use of the merchandise in question as refractory material. Their combined testimony shows that the company is but a small branch of the Carborundum Co.'s organization, with relatively small production. More than 90 per centum of the refractories manufactured by them are produced from silicon carbide. Material

like that under consideration was used before the war, in 1940, in manufacturing for the Navy Department refractory bricks used for lining furnaces in oil-burning vessels, but "Unfortunately most of them were sunk and the war ended that business." Since then, the company has been unable to develop any demand for this material. Because of prohibitive cost, it has "a very limited field" and it has been difficult to "find even a small market for it." A small concern in Ohio "buys 40 or 50 brick at a time and they use them for a little valve-heating furnace." A sales catalog issued in 1940 (defendant's exhibit 7) states that "It was early recognized that 'Carborundum' and 'Aloxite' (The Carborundum Company's registered trade names for silicon carbide and aluminum oxide) were important as refractory materials in addition to being superior abrasives," and mentions "Aloxite" as one of the company's registered trade marks for products of its refractory division. Oral testimony, referring to the products named in said catalog, explains that "As far as the manufacturing goes, they are somewhat entirely separate from Niagara Falls, but as far as the items that our Sales Department sells, that involves other items that are made at Niagara Falls which may or may not be refractories. Furthermore, of course all that Alfrax B and BI [refractory bricks] was made when we got into that Navy stuff and our Sales Department was a little optimistic then, but certainly nothing has come of it since."

The testimony of the Government chemist, who analyzed the instant merchandise, is somewhat corroborative of what was previously offered, so no detailed discussion thereof is deemed necessary.

Defendant's evidence is not sufficient to disturb plaintiff's proof establishing that "Aloxite" is a recognized proprietary term of the Carborundum Co. used to designate its aluminous abrasives, that the said term has been consistently so used since 1917, that the material in question is a form of "Aloxite" which was not developed for commercial use until 1942, and that all "Aloxite," the forms available at and prior to the time of enactment of the Tariff Act of 1930, as well as those developed since then, have been and are now chiefly used in the manufacture of abrasives.

Plaintiff's claim is based on the premise (1) that the provision "crude artificial abrasives," is a provision predicated on use, (2) that chief use at the time of enactment of the Tariff Act of 1930 is controlling in determining whether or not merchandise is classifiable under said provision, and (3) that although the present merchandise was not developed commercially until long after the passage of the Tariff Act of 1930, it is within a class of merchandise "Aloxite," which, on and prior to the date of enactment of the tariff act, was "crude artificial abrasives," as that term is contemplated by said paragraph 1672.

Defendant, on the other hand, contends that the merchandise in question is in fact aluminum oxide, and under the authority of *C. J. Tower & Sons* v. *United States*, 24 C. C. P. A. 332, T. D. 48769, it is a form of "refined bauxite," as the term is used in paragraph 6, *supra*, properly classifiable thereunder, as assessed by the collector. While the material involved in the *Tower* case, *supra*, and that under discussion here, are substantially the same, so far as constituent elements are concerned, the issue in each case is so different as to make them distinguishable. In the cited case, the merchandise was classified as an earthy or mineral substance, paragraph 214 of the Tariff Act of 1930, and claimed to be dutiable under the provision for "Aluminum hydroxide or refined bauxite, one-half of 1 cent per pound," in paragraph 6, *supra*. In the present case, the collector adopted the classification applied by the court in the *Tower* case, *supra*, but plaintiff here, unlike the importer in the cited case, seeks free entry for the merchandise under the provision for "crude artificial abrasives, not specially provided for," which, as hereinabove stated, plaintiff contends is a "use" provision and therefore prevails over the *eo nomine* designation under which it was classified.

The following definition (Webster's New International Dictionary) of "abrasive" supports the claim that "use" is an element in the present issue:

**abrasive,** *n.* Any substance used for abrading, as for grinding, polishing, etc. It is often made into grinding wheels with a binder, or attached to paper or cloth with glue. The principal natural abrasives are *emery, corundum, garnet, pumice, tripoli*, and *quartz sand*. The principal manufactured abrasives are *silicon carbide* and fused *aluminum oxide*.

When a tariff provision is predicated on "use," like the one invoked by plaintiff, the controlling factor is chief use, and it is the time of enactment of the Tariff Act of 1930 that is determinative. The rule was expressed in *United States* v. *F. W. Myers & Co., Inc.*, 24 C. C. P. A. 464, T. D. 48913, as follows:

Under the well-settled rule of this and other courts, an *eo nomine* designation, the meaning of which is in question, must be determined as of the date of the passage of the act. In determining the meaning of a word which meaning depends upon its use, it has always been the law that proof of that use is confined to the time prior to and on the date of the passage of the act in which the term is used. In other words, what did the term mean when Congress used the same? *Goldsmith's Sons* v. *United States*, 13 Ct. Cust. Appls. 69, T. D. 40932; *Wilbur-Ellis Co.* v. *United States*, 18 C. C. P. A. (Customs) 472, T. D. 44762.

Plaintiff, in alleging that the instant material is within a class of crude artificial abrasives, so recognized at the time of passage of the Tariff Act of 1930, and therefore entitled to free entry under paragraph 1672, *supra*, seeks to invoke the tariff rule of construction that a provision based upon use includes all kinds or forms of the commodity

used for the suggested purpose. The principle was enunciated in *United States* v. *Belgam Corp. et al.*, 22 C. C. P. A. 402, T. D. 47402, holding certain cotton rags, which were shown to be of the class chiefly used for paper making at the time of passage of the Tariff Act of 1922, to be classifiable as "paper stock," notwithstanding their use as wiping rags on the dates of their importation. The same rule was applied in *United States* v. *C. J. Tower & Sons*, 26 C. C. P. A. (Customs) 1, T. D. 49534, in which the court excluded from classification as "standard newsprint paper," certain paper used for printing newspapers at the time of its importation, but which was not of the class so used at the time of enactment of the tariff act.

The same rule has application here from established facts disclosing that "Aloxite" was, at the time of passage of the tariff act, a class of merchandise chiefly used for abrasive purposes, and that the material in question is a form of "Aloxite," differing only in its globular, pill-like shape, from the blocks or chunks ordinarily produced.

*Harrison Supply Co. et al.* v. *United States*, 6 Ct. Cust. Appls. 72, T. D. 35326, decided as early as April 14, 1915, discussed the provision for "crude artificial abrasives" in paragraph 432 of the Tariff Act of 1909. The case involved merchandise generally known as iron shot, iron sand, or iron grit, in globular and angular shapes. The angular material was obtained by crushing the globular shapes, whose production was described by the court as follows:

A miscellaneous amount of iron and scrap metals are put into a cupola and melted together with coke and limestone and other minerals, and this molten metal runs down a short runway—the molten metal is about the thickness of a finger—and drops on a jet of steam at approximately eighty pounds pressure, which scatters the molten metal into water. It drops into water.

In its consideration of the provision "crude artificial abrasives," under which the importer sought classification, the court said:

It will be noticed that the part relied upon by the importers [crude artificial abrasives] follows provisions for manufactured, ground, pulverized, or refined emery, and manufactures of which emery or corundum is the component material of chief value. The term "artificial abrasives" implies an abrasive product resulting from some processing or treatment, and the word "crude" implies that such artificial product must be in a crude condition. We do not think this merchandise is such, *because it is finished and ready for any use for which it is primarily designed, and is even graded for the convenience of such uses.* It does not follow, because this is its first appearance as an article of commerce, that it is crude; a finished, and not a crude condition may be a necessary incident to the methods employed in its production. If the molten metal had been permitted to harden before being made into shot or sand and in that condition was imported, it might then be a crude artificial abrasive. But such a stay in its production probably is not, in a manufacturing sense, feasible or practicable and is not, therefore, employed. At all events we have here for consideration a finished and not a crude article; one not primarily designed or intended to be further processed or treated and which, as a matter of fact, is not, except in relatively small quantities.

· It might well be argued that the term "crude artificial abrasives," as employed in paragraph 432, contemplates an artificial abrasive that has not, by manufacturing, grinding, pulverizing, or refining, been reduced to small particles, such as "grains." In other words, that it relates to an artificial abrasive imported in larger units or cruder forms than grains or the grades in the case at bar. [Italics added.]

The merchandise in question differs from that involved in the *Harrison Supply Co.* case, *supra*. Here, the importation is not ready for its use as an abrasive, but must be pulverized and graded before being so used. The importance of the said case to the present issue lies in its analysis of the statutory provision "crude artificial abrasives," which can be applied to the instant merchandise. The material in question is partially purified bauxite, the result of treatment, through which it retains to a definite degree certain impurities inherent to the natural mineral. Such impurities possess desirable abrasive properties. The quick-cooling process merely gives to the imported merchandise its form as "bubbles"; it is not treatment advancing the condition of the material, which must be substantially processed to fit it for its use as an abrasive. As imported, the merchandise is in a crude condition. *Togasaki & Co. et al. v. United States*, 12 Ct. Cust. Appls. 463, T. D. 40667.

Having determined that the instant material is a crude artificial abrasive and a form of "Aloxite," our next consideration must be directed toward a finding whether "Aloxite" is a class of crude artificial abrasives which was so recognized at the time of passage of the tariff act. There is uncontradicted testimony herein that the term was used as early as 1917 to designate such a class of merchandise, and the Summary of Tariff Information of 1921 contains comment lending support to such proof. The volume is a compilation prepared by the United States Tariff Commission and contains pertinent information concerning the Fordney Bill (H. R. 7456), that ultimately became the Tariff Act of 1922, under which "crude artificial abrasives" were also admitted free of duty, paragraph 1570. The official preparation embodies descriptive and economic data on commodities mentioned in the bill, and covers descriptions and uses of the articles. Under the heading "ARTIFICIAL ABRASIVES" (page 1120), appears the following:

*Description and uses.*—Artificial abrasives are of two kinds (1) silicon carbides, sold under the trade names of carborundum, crystolon, and carbolon; and (2) aluminum oxides, sold as alundum, aloxite, exolon, and lionite. Artificial abrasives sold under other names are either the above products or are imported materials marketed under special trade names. Carbide of silicon is the best abrasive for use on cast iron, brass, bronze, and other metals of low tensile strength, and marble, granite, pearl, leather, and carbon. It is also used in the form of bricks as a refractory in furnace construction. Oxide of aluminum is the best abrasive for grinding steel and wrought iron. It also has found considerable use as a

refractory and filtering medium. These artificial abrasives, by far the most important abrasive materials, have replaced emery and corundum to a large extent.

The consistent recognition of "Aloxite" as an artificial abrasive is revealed in "Digests of Trade Data" prepared by the United States Tariff Commission (1938) in connection with the "Second Trade Agreement between the United States and Canada," wherein it is stated (page 16–41):

Synthetic abrasives of silicon carbide (carborundum, crystolon, carbolon,. electrolon) and of aluminum oxide (alundum, aloxite, exolon, lionite) are made in considerable tonnage at Niagara Falls, N. Y., and Worcester, Mass., and are also either made or processed in Conniston, Ala., Blazedell and Troy, N. Y., Littleton, N. H., and Perth Amboy, N. J.

The foregoing follows a general statement in the same official publication, which includes an admission to the effect that synthetic aluminum oxide and silicon are crude artificial abrasives comprising the classification "not specially provided for" in paragraph 1672 of the Tariff Act of 1930.

The quotations from the two official documents, just referred to, emphasize the fact that "Aloxite" is a class of merchandise that was chiefly used for abrasive purposes at the time of enactment of the Tariff Act of 1930. The merchandise in question, being a crude artificial abrasive of the "Aloxite" class, is, under the principle announced in the *Tower* case, 26 C. C. P. A. 1, T. D. 49534, and the *Belgam Corp.* case, *supra*, classifiable under said paragraph 1672, as claimed.

Our conclusion herein is consistent with that reached in *C. J. Tower & Sons* v. *United States* (17 Cust. Ct. 72, C. D. 1023), presenting the identical issue concerning classification of so-called "Alundum" which was decided on September 13, 1946.

The protest is sustained and judgment will be rendered accordingly.